**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**
**CIVIL ACTION NO. 3:21-CV-327-DCK**

| | | |
|---|---|---|
| **INTERFACE SECURITY SYSTEMS, L.L.C.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **ORDER** |
| | ) | |
| **FAMILY DOLLAR, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

**THIS MATTER IS BEFORE THE COURT** on "Defendant's Motion For Summary Judgment" (Document No. 38); "Interface Security Systems, L.L.C.'s Motion For Partial Summary Judgment" (Document No. 41); and "Defendant's Motion To Strike Declaration Of Kenneth Obermeyer In Support Of Interface Security Systems, L.L.C.'s Damages Methodology And Evidence" (Document No 65). The parties have consented to Magistrate Judge jurisdiction pursuant to 28 U.S.C. § 636(c), and these motions are ripe for disposition. Having carefully considered the motions, the record, applicable authority, and the arguments of able counsel at a hearing on July 12, 2023, the undersigned will grant in part and deny in part Defendant's motion for summary judgment; deny Plaintiff's motion for summary judgment; and grant Defendant's motion to strike.

## I.    BACKGROUND

### A.  Facts

Interface Security Systems, L.L.C. ("Plaintiff," "Interface," or "ISS") "is a Louisiana limited liability company with its principal place of business in Earth City, Missouri." (Document

No. 1, p. 1). ISS "is in the business of providing equipment and managed physical and network security services to residential and commercial customers." Id.

> These services include private wide area networks, alarm monitoring, remote video monitoring, Voice over IP ("VoIP") and business intelligence solutions and services, as well as sophisticated digital witness services ("Digital Witness Services" or "Interactive Services"), which are interactive video security monitoring services that require specialized equipment, including but not limited to cameras, audio systems, DVRs and Digital Acoustics audio boards and expanders, much of which was housed in a custom cabinet provided by ISS, which cabinet was generally located in the site manager's office (collectively the "Digital Witness Equipment").

(Document No. 42, p. 9); see also (Document No. 1, p. 1).

Family Dollar, Inc. ("Defendant," "Family Dollar," or "FD") "is a North Carolina corporation with its principal place of business in Chesapeake, Virginia." (Document No. 1, p. 1). "Family Dollar operates approximately 7,800 retail stores across America that provide general consumable merchandise at discounted prices." Id. "Dollar Tree, Inc. ("Dollar Tree") acquired ownership of Family Dollar on July 6, 2015." Id.

ISS and Family Dollar entered into a "Master Services Agreement" (the "Initial MSA") in April 2014, "whereby ISS agreed to provide Family Dollar with certain equipment and an associated suite of services including certain Flat Rate Managed Services for over 7,000 retail stores ("Network Services")." (Document No. 1, p. 2) (citing Document No. 34); see also (Document No. 42, p. 9). "Under the MSA, ISS also provided phone, internet, and other related services to Family Dollar stores." Id.

The parties executed an "Amended and Restated Master Services Agreement" (Document No. 35) (the "MSA") in February 2016. (Document No. 1, pp. 2-3); see also (Document No. 39, p. 6, Document No. 42, p. 9). The "Digital Witness Interactive Video Systems and Services

2

Statement Of Work" (Document No. 35, pp. 19-37) (the "Digital Witness SOW") was incorporated as an exhibit to the MSA. Id. The Digital Witness SOW was amended three (3) times. (Document No. 39, p. 7, Document No. 42, pp. 9-10). The MSA, including the Digital Witness SOW and its amendments, "(collectively the 'Contract') governs the instant dispute." (Document No. 42, p. 10).

The Digital Witness Services provided by ISS to FD, pursuant to the MSA, "require the use and operation of Digital Witness Equipment," much of which "is complex, proprietary equipment which ISS designed and custom manufactured through various partners." (Document No. 1, p. 3). "The Contract provided for two variations of pricing to Family Dollar stores where Digital Witness Services were provided: Conversions and New Builds." (Document No. 42, p. 10) (citing Document No. 35, p. 23). Plaintiff describes the arrangement as follows:

> Conversions were stores where the existing security services were converted from a prior provider to ISS's Digital Witness Services ("Conversions"). *Id.* New Builds were Family Dollar stores without existing security services ("New Builds"). *Id.* Both Conversions and New Builds paid an identical recurring monthly fee for the Digital Witness Services. . . .
>
> The pricing terms for the Digital Witness Equipment necessary to support the Digital Witness Services differed. . . . In the Conversions, the Digital Witness Equipment was installed **at no cost** to Family Dollar. . . . In the New Builds, the Digital Witness Equipment was installed at the cost of **$14,000 per store**. . . . Family Dollar chose not to purchase the Digital Witness Equipment installed in the Conversions because it represented to ISS that it did not have money in its budget to purchase such equipment. (M. Shaw Dec. ¶ 10). Accordingly, ISS agreed to install the Digital Witness Equipment at no cost, with ownership of the Digital Witness Equipment remaining with ISS. *Id.*

(Document No. 42, pp. 10-11) (citations omitted). See also (Document No. 39, pp. 7-9).

"On or about December 18, 2019, Family Dollar notified ISS that it intended to terminate the Digital Witness Services which ISS was providing and enter into a separate agreement with a

3

third party which would provide a similar but different suite of services to Family Dollar."

(Document No. 1, p. 3). Regarding termination, Section 6 of the MSA provides:

> **Return or Purchase of ISS Owned Equipment Upon Termination**. With respect to any equipment owned by ISS that is installed at a FD location, FD shall, at its sole cost, promptly and without demand return all such equipment to ISS at the termination of this Agreement or termination of Service at such FD location; provided, however, that FD shall have, at its option, the right to purchase all such equipment at such location. In the event FD elects to purchase such equipment, then, **in lieu of returning such equipment to ISS, FD may purchase such equipment in accordance with the purchase price formula set forth in the applicable SOW**.

(Document No. 1, p. 4, Document No. 35, p. 4, Document no. 39, p. 10, Document No. 42, p. 10) (emphasis added).

Following notice of Family Dollar's termination of ISS' security services, on or about May 18, 2020, ISS sent a letter to Family Dollar's new parent, Dollar Tree, regarding "the prompt return of any equipment not purchased by [Family Dollar] consistent with the [Family Dollar/ISS] MSA." (Document No. 42, p. 12). "Family Dollar responded to ISS's letter on June 3, 2020, confirming that it 'will work out the proper disposition of ISS owned equipment with your people consistent with contractual obligations.'" Id. (citations omitted). In its Complaint, Plaintiff asserts that "[d]espite multiple demands, Family Dollar has refused to return any of such Digital Witness Equipment nor purchased any of such Digital Witness Equipment from ISS." (Document No. 1, p. 4).

The parties agree that the issue before the Court is the ownership of the Digital Witness Equipment installed at the Conversions. (Document No. 42, pp. 12-13, Document No. 39, pp. 5-6). Both sides argue that the Contract is clear. (Document No. 39, p. 6; Document No. 42, p. 13). Plaintiff contends that Defendant must return or purchase all equipment provided to the

4

Conversion sites; and Defendant contends that "once the digital witness equipment was installed, it belonged to Family Dollar." Id.

**B. Procedure**

Plaintiff initiated this action with the filing of its "Complaint" (Document No. 1) on July 7, 2021. The Complaint asserts claims for: (1) breach of contract; (2) conversion; and (3) unjust enrichment. (Document No. 1, pp. 5-6). Plaintiff contends that the Digital Witness Equipment "has a current estimated value of over $2.5 million dollars" and thus seeks "an award of damages in excess of $2.5 million." (Document No. 1, pp. 6-7).

The parties filed a "Joint Stipulation Of Consent To Exercise Jurisdiction By A United States Magistrate Judge" (Document No. 9) on July 23, 2021, and this case was reassigned to the undersigned Magistrate Judge on July 26, 2021. Defendant's "Answer" (Document No. 12) was filed on August 20, 2021.

The Court issued a "Case Management Order" (Document No. 14) on September 10, 2021. The Case Management Order, *inter alia*, set the following deadlines: discovery completion – March 1, 2022; mediation report – April 29, 2022; dispositive motions – May 13, 2022; and trial – October 3, 2022. (Document No. 14). Those deadlines were later extended. See (Document Nos. 20, 21, 32, 33, 50). This matter is currently set for a bench trial during the undersigned's trial term beginning August 28, 2023. (Document No. 57).

The pending cross motions for summary judgment were filed on August 15, 2022, and have been fully briefed. (Document Nos. 38, 39, 41, 42, 44, 47, 51, 52).

On May 2, 2023, the undersigned directed the parties to file supplemental briefs "focused on arguments and relevant legal authority related to Plaintiff's forecast of admissible evidence of damages and its methodology in support of its damages claim." (Document No. 57). The parties'

5

filing was limited to "a supplemental brief of **five (5) pages** or less." Id. The parties timely filed their supplemental briefs. (Document Nos 63, 64). However, Plaintiff's five (5) page "…Supplemental Brief Regarding Damages" attached an additional five (5) page "Declaration Of Kenneth Obermeyer In Support Of Interface Security Systems, L.L.C.'s Damages Methodology And Evidence" (Document No. 63-1). "Defendant's Motion To Strike Declaration Of Kenneth Obermeyer In Support Of Interface Security Systems, L.L.C.'s Damages Methodology And Evidence" (Document No 65) was filed on July 10, 2023, and has also been fully briefed.

The undersigned held a status and motions hearing on July 12, 2023.

Based on the foregoing, the motions are now ripe for review and disposition.

## II. STANDARD OF REVIEW

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal citations omitted). Only disputes between the parties over material facts (determined by reference to the substantive law) that might affect the outcome of the case properly preclude the entry of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute about a material fact is "genuine" only if the evidence is such that "a reasonable jury could return a verdict for the nonmoving party." Id.

Once the movant's initial burden is met, the burden shifts to the nonmoving party. Webb v. K.R. Drenth Trucking, Inc., 780 F.Supp.2d 409 (W.D.N.C. 2011). The nonmoving party

6

opposing summary judgment "may not rest upon the mere allegations or denials of his pleading, but ... must set forth specific facts showing there is a genuine issue for trial." <u>Anderson</u>, 477 U.S. at 248. In deciding a motion for summary judgment, a court views the evidence in the light most favorable to the non-moving party, that is, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." <u>Anderson</u>, 477 U.S. at 255. At summary judgment, it is inappropriate for a court to weigh evidence or make credibility determinations. <u>Id.</u>

## III.   DISCUSSION

The parties agree that the question before the Court is governed by North Carolina law, and that under North Carolina law a breach of contract requires the following elements: (1) the existence of a valid contract, and (2) breach of the terms of the contract. (Document No. 39, p. 16) (citing <u>Poor v. Hill</u>, 138 N.C.App. 19, 26 (2000)) and (Document No. 42, p. 15) (citing <u>Hounds Design v. Brezinski</u>, 3:13-CV-101-RJC-DCK, 2014 WL 4407015, at *4 (W.D.N.C. Sept. 8, 2014)). Here, the parties do not dispute the validity of the Contract; "the only question for this Court to determine is the meaning of the contract terms in dispute." (Document No. 39, p. 16).

"Interpreting a contract requires the court to examine the language of the contract itself for indications of the parties' intent at the moment of execution." <u>RME Mgmt., LLC v. Chapel H.O.M. Associates, LLC</u>, 251 N.C.App. 562, 567 (2017); <u>see also</u> (Document No. 42, p. 15). "When the language of a contract is plain and unambiguous then construction of the agreement is a matter of law for the court." <u>Id.</u> (quoting <u>Whirlpool Corp. v. Dailey Constr., Inc.</u>, 110 N.C.App. 468, 471 (1993). "Essential terms of a contract include the parties, the subject matter of the agreement, and the price to be paid under it." <u>Foodbuy, LLC v. Gregory Packaging, Inc.</u>, No. 3:16-CV-809-FDW-DCK, 2018 WL 4603159, at *21 (W.D.N.C. Sept. 25, 2018), <u>aff'd in part, vacated in part, remanded,</u> 987 F.3d 102 (4th Cir. 2021) (quoting <u>Apple Tree Ridge Neighborhood</u>

7

Ass'n v. Grandfather Mountain Heights Property Owners Corp., Inc., 206 N.C.App. 278, (2010)) (emphasis added).  See also Stillwagon v. Innsbrook Golf & Marina, LLC, 2014 WL 5871188, *3 (E.D.N.C. Nov. 12, 2014) ("Price is an essential term.").

"An ambiguity exists where the language of a contract is fairly and reasonably susceptible to either of the constructions asserted by the parties."  Id. (quoting Holshouser v. Shaner Hotel Grp. Props. One Ltd. P'ship, 134 N.C.App. 391, 397 (1999));  see also (Document No. 42, p. 17; (Document No. 39, p. 16).  "It is the province of the court to determine the existence of ambiguities in a contract."  UBA, LLC v. Thyssenkrupp Elevator Corp., 2017 WL 544586, at *3 (E.D.N.C. Feb. 9, 2017).  "Such an ambiguity may be found if a specific term is not defined in the contract and both parties offer different understandings of that term."  (Document No. 42, p. 16) (citing Integrated Sols. Int'l, LLC v. Central Transport, Int'l, Inc., 2009 WL 579232, at *5 (M.D.N.C. Mar. 9, 2009)).

**A.  Defendant's Motion For Summary Judgment**

According to Defendant, the documents that collectively form the parties' Contract are "susceptible to only one reasonable interpretation – Family Dollar owns the digital witness equipment ISS installed pursuant to the Digital Witness SOW."  (Document No. 39, p. 16);  see also (Document Nos. 35, 40-1, and 40-3).  Defendant presents four main arguments in support of its position that it is entitled to summary judgment.

1.  <u>The Contract Unambiguously States that the Equipment is Owned by Family Dollar</u>

First, Defendant argues that the only fair and reasonable construction of the ordinary meaning of the language in the Digital Witness SOW leads to the conclusion that Defendant owned the installed equipment at the conversion sites.  (Document No. 39, p. 17).  The relevant section of the Digital Witness SOW states in full:

8

> 2.2 **TERMS AND CONDITIONS.** Subject to the terms and conditions hereinafter set forth, ISS agrees to install or cause to be installed Family Dollar owned equipment (including equipment FD shall purchase from ISS pursuant to this DW SOW; for clarity, title to such equipment shall transfer to FD at the time such equipment is Installed) and to provide additional services as described in this DW SOW for DW System, consisting of the equipment specified in Section 4 and the applicable provisions of Section 3.

(Document No. 35, p. 22; Document No. 37-2, p. 22).

Defendant asserts that "'Family Dollar owned equipment' means exactly what it says – Family Dollar owns the equipment." (Document No. 39, p. 17) (quoting Document No. 37-2, p. 22). Moreover, "'title to such equipment shall transfer to FD' means exactly what it says – FD received title to the digital witness equipment as soon as ISS installed it." Id.

Defendant suggests that the "plain meaning of Section 2.2 is further confirmed when read in conjunction with other sections of the Digital Witness SOW." (Document No. 39, p. 18). For example, Defendant cites to Section 7 which states that "FD shall purchase DW systems from ISS for the applicable price as set forth in Section 3." Id. (citing Document No. 37-2, p. 29). "The applicable price set forth in Section 3.1(c) for conversion sites is '$0.00' and the price for new builds is '$14,000.'" Id. (citing Document No. 37-2, p. 23). Defendant also points to Section 11 which states "ISS agrees to install or cause to be installed equipment to be Family Dollar owned and provide additional services as described in this DW SOW." Id. (citing Document No. 37-2, p. 35). Defendant notes that each of the cited sections "describes the equipment installed as Family Dollar owned." Id.

In addition, Defendant asserts that "[a] comparison of the Digital Witness SOW with the Flat Rate SOW further confirms that the digital witness equipment is Family Dollar-owned." (Document No. 39, p. 19). Defendant relies on the following language from the Flat Rate SOW:

9

ISS will provide a fully-managed flat rate managed services solution for all designated existing and new Family Dollar stores. To accomplish this ISS will procure, own (excluding any equipment purchased by FD pursuant to Schedule B to this SOW), install, manage and maintain all CPE to provide the managed services included within, per the attached Schedules of this SOW including:

(Document No. 40-1, p. 2).

Defendant contends that "the equipment ISS provided under the Flat Rate SOW, except for burglar alarm equipment Family Dollar purchased under Schedule B, was owned by ISS." (Document No. 39, p. 19. "Because that equipment is ISS-owned, the Flat Rate SOW – unlike the Digital Witness SOW – includes in its Exhibit 3 a purchase price formula as required by Section 6 of the MSA." Id. (citing Document No. 40-1, p. 13). Defendant argues that "the Digital Witness SOW contains no purchase price formula because Family Dollar already owned the equipment." Id.

Plaintiff notes in its "…Brief In Opposition…" that "[t]here is **no debate** that 'Family Dollar owned equipment' exists, and there is **no debate** that Family Dollar owns the Digital Witness Equipment that it purchased from ISS." (Document No. 47, p. 5). However, Plaintiff asserts that the "apparent contractual ambiguity" underlying this dispute is "who owns the Digital Equipment that ISS installed at no cost in the Conversions?" Id. According to Plaintiff, the Contract answers this question with "a key parenthetical in Section 2.2, which defines 'Family Dollar owned equipment' to include equipment that Family Dollar **purchases from ISS**." Id. "The parties' differing consideration and understanding given to this parenthetical, as well as a lack of defined terms such as 'ISS owned' and 'purchase,' creates ambiguity." Id.

Addressing Defendant's first summary judgment argument, Plaintiff argues that "the Contract **does not** unambiguously state the Digital Witness Equipment that ISS installed at

Conversions at no cost was Family Dollar owned." (Document No. 47, p. 17). Rather, the "express terms of the Contract reflect a practical, economically-sound agreement between the parties: Family Dollar owns the equipment that it purchased from ISS; and ISS owns the equipment that Family Dollar has not purchased." Id.

Plaintiff notes that both the Digital Witness SOW and the Flat Rate SOW contain parentheticals that explain ownership and "are meaningful and remarkably parallel." Id. See also (Document No. 35, p. 8; Document No. 40-1, p. 2). Both "link Family Dollar's ownership of equipment to **only that which is purchased from ISS**." (Document No. 47, p. 18). According to Plaintiff, the only "purchase price" in Section 3 is the "$14,000 purchase price for new builds or new DW systems"; there is no "purchase price" terminology for Conversions, only a reference to a "NRC (Non-Recurring Charge)" of "$0.00 for conversions." Id. (quoting Document No. 35, p. 23).

Plaintiff goes on to assert that Defendant's interpretation results in surplusage of language in the Contract. (Document No. 47, p. 19). According to Plaintiff, Defendant's "construction is prohibited because it reads-out the explanatory parentheticals and renders other pricing terms in the Digital Witness SOW as surplusage." Id. For example, Plaintiff contends that based on Defendant's arguments, the parenthetical in the Digital Witness SOW has no purpose and could have stated:

> Subject to the terms and conditions hereinafter set forth, ISS agrees to install or cause to be installed Family Dollar owned equipment (~~including equipment FD shall purchase from ISS pursuant to this DW SOW~~; for clarity, title to such equipment shall transfer to FD at the time such equipment is Installed) and to provide additional services as described in this DW SOW for DW System, consisting of the equipment specified in Section 4 and the applicable provisions of Section 3.

Id.

11

Plaintiff further asserts the itemized pricing in Section 3.1 is unnecessary if, as Defendant suggests, anything installed is automatically owned by Family Dollar.  Id.; see also (Document No. 35, p. 3).  Because of this alleged surplusage, Plaintiff contends that Defendant's interpretation of the Contract must be rejected.  (Document No. 47, p. 20) (citing Foodbuy LLC, 2018 WL 4603159, at *21).

Next, Plaintiff argues that Defendant's interpretation negates the ordinary meaning of "purchase."  Id.  Plaintiff notes that Merriam-Webster defines "purchase" as "something obtained especially for a price in money or its equivalent," and that Black's Law Dictionary defines "purchase" as "[t]he act or an instance of buying."  Id.  Plaintiff argues that Defendant's position that it "purchased" the Digital Witness equipment for $0.00 "is disingenuous and turns the usual and ordinary meaning of 'purchase' on its head."  Id.

In reply, Defendant states that "[t]he only document the Court needs to decide this case is the contract."  (Document No. 51, p. 7).  Defendant further argues that:

> [the] contract states clearly that the digital witness equipment ISS installed at all sites, including conversion sites, is Family Dollar-owned.  The Digital Witness SOW says *nothing* about ISS-owned equipment; instead, it states the equipment is Family Dollar-owned.  When the Digital Witness SOW is read in the context of the MSA and Flat Rate SOW, it further clarifies that the conversion equipment would be Family Dollar-owned.  The principal objective in the interpretation of a contract's provisions is to ascertain the intent of the parties. . . .  Where the language of a contract is "clear and only one reasonable interpretation exists, the courts must enforce the contract as written . . . ."

Document No. 51, p. 9) (citations omitted).

    2.  <u>Even if the Contract is Ambiguous, the Extrinsic Evidence Shows the Equipment is Owned by Family Dollar</u>

Defendant next argues that even if the Contract is ambiguous, "summary judgment is still required because ISS has no extrinsic evidence suggesting the parties intended for the conversion equipment to be owned by ISS." (Document No. 39, p. 20). "When unclear from the four corners of the agreement, the parties' intent in forming the contract is to be ascertained by the subject matter, the end view, the purpose sought, and the situation of the parties at the time." Id. (citing McLean v. Spaulding, 273 N.C.App. 434, 440 (2020)).

Defendant contends that "ISS has the burden to show that extrinsic evidence supports its reading of the contract" and that "[h]ere, no extrinsic evidence raises a genuine issue of material fact as to the interpretation of the contract." (Document No. 39, p. 23) (citations omitted). "Only when the 'resort to extrinsic evidence in the summary judgment materials leaves genuine issues of fact respecting the contract's proper interpretation,' must 'interpretation [be] left to the trier of fact.'" Id. (quoting Goodman v. Resolution Trust Corp., 7 F.3d 1123, 1126 (4th Cir. 1993)).

Plaintiff ISS, of course, disagrees with Defendant's position on the available extrinsic evidence. (Document No. 47, pp. 22-27). Plaintiff argues that "the extrinsic evidence of the parties' actions and conduct reflects ISS's ownership of the Digital Witness Equipment it installed at the Conversions." (Document No. 47, p. 22).

Plaintiff asserts that the only extrinsic evidence Defendant identifies is the testimony of its own employees. (Document No. 47, p. 23). Plaintiff contends that "[c]onspicuously," Family Dollar did "not produce any internal documents establishing Family Dollar's understanding or other conduct during the course of the Contract reflecting that it owned Digital Witness Equipment installed by ISS as part of the Digital Witness Services in the Conversions at no cost." Id.

In contrast, Plaintiff argues that there is "substantial undisputed documentation of record that supports ISS's construction of the Contract and ownership of the Digital Witness Equipment

13

at the Conversions." (Document No. 47, p. 24). According to Plaintiff, the Contract would "not make economic sense if ISS did not retain ownership of the equipment that was not purchased up front," and that its "course of dealing and long-standing policies and practices support ownership." Id. For example, Plaintiff explains its policy/practice as follows:

> One of the primary reasons that ISS retains title to the Digital Witness Equipment in situations such as this is to encourage the customer to renew its agreement upon the expiration of the initial term. *Id.* at ¶ 24. Industry experience reflects that it is more difficult for a customer to transition to a competitor if it must either return the existing equipment which has already been installed or make a considerable payment to its existing security company. *Id.* That is why it is industry practice, as well as the practice of ISS, to structure the economics of a deal such that the security alarm company retains title to equipment, absent a significant upfront purchase fee in order to render the transaction economically feasible even if terminated without renewal. *Id.* Here, given the relatively short initial term and the sophisticated, costly nature of the Digital Witness Equipment, it was critical to the overall economics of the transaction for ISS to retain ownership. *Id.* at ¶ 25. ISS would never have entered into the Digital Witness SOW for the Conversions without retaining ownership of the Digital Witness Equipment. *Id.*

(Document No. 47, p. 25).

In addition, Plaintiff suggests that the parties' accounting practices support its interpretation of the Contract. (Document No. 47, p. 26) (citation omitted). Apparently, ISS treated the Digital Witness Equipment "as an asset and subsequently depreciated [it] together with other assets owned by ISS." Id. "In significant contrast, Family Dollar did **not** account for the Digital Witness Equipment installed at Conversions as an asset on its financial statements." Id.

Plaintiff also notes that when the Contract was terminated, "ISS sent a letter to Family Dollar demanding the 'prompt return of any equipment not purchased by [Family Dollar] consistent with the [Family Dollar/ISS] MSA." (Document No. 47, p. 27). Instead of challenging this demand, Family Dollar, in consultation with counsel, responded "that it 'will work out the

14

proper disposition of ISS-owned equipment with your people consistent with our contractual obligations.'" Id.

In reply, Defendant suggests that Plaintiff's practices and policies, including its accounting practices related to the disputed equipment, "*is not* competent evidence of the parties' *mutual* intent." (Document No. 51, p. 10) (citations omitted). Defendant also asserts that it "could not depreciate the equipment as a capital asset because no cash was exchanged and Family Dollar had no basis in it." (Document No. 51, p. 11).

### 3. Plaintiff's Remaining Claims Fail as a Matter of Law

Next, Defendant argues that Plaintiff's remaining claims for conversion and unjust enrichment must fail as a matter of law. (Document No. 39, pp. 24-25). Family Dollar notes that it "cannot steal equipment it owns," and because it "owns the equipment at issue, … the conversion claim fails as a matter of law." Id. (citations omitted).

Regarding unjust enrichment, Defendant argues that such a claim is "only available when no contract governs the relationship between the parties." (Document No. 39, p. 25) (citing Rongotes v. Pridemore, 88 N.C.App. 363, 368 (1988); Synergy Fin., L.L.C. v. Zarro, 329 F.Supp.2d 701 (W.D.N.C. 2004)). Here, "[n]either party contests the validity or existence of the contract between them." Id.

In response, Plaintiff argues that its alternative claims for conversion and unjust enrichment should stand. (Document No. 47, p. 27). Plaintiff asserts that Defendant "admits that it has not returned or purchased any of the Digital Witness Equipment at the Conversions, and admits that it paid nothing for such Digital Witness Equipment." Id. Moreover, "Family Dollar admits that it has used certain Digital Witness Equipment in the stores converted to its new security vendor, ADT." Id. Plaintiff, does not, however, cite to any legal authority. Id.

15

"Defendant's Reply Brief…" does not provide any further support for its arguments regarding the conversion and unjust enrichment claims. (Document No. 51).

4. Plaintiff Cannot Forecast Competent Evidence of Damages

Finally, Defendant argues that "ISS's evidence of damages is also insufficient as a matter of law." (Document No. 39, p. 25) (citing PLS Invest., LLC v. Ocwen Loan Serv., LLC, 5:14-CV-139-DCK, 2017 WL 424897, at *9 (W.D.N.C. Jan. 31, 2017) (aff'd 699 Fed.Appx. 166 (4th Cir. Oct. 17, 2017)). Defendant notes that "[t]he burden of proving damages is on the party seeking them and that party 'must show that the amount of damages is based upon . . . something more than just hypothetical or speculative forecasts.'" Id. (citing Stillwagon, 2014 WL 5871188, at *5). "Where a party fails to forecast competent evidence of damages to support its claim, summary judgment is appropriate." (Document No. 39, pp. 25-26) (citing PLS Invest., LLC, 2017 WL 424897, at *9-11 (granting summary judgment because plaintiff failed to show facts sufficient to support its claim for damages). "Whether a party's evidence meets the 'reasonable certainty' standard is a question of law for the court." Stillwagon, 2014 WL 5871188, at *5 (quoting Ross v. Wash. Mut. Bank, 566 F.Supp.2d 468, 482 (E.D.N.C. 2008), aff'd, 625 F.3d 808 (4th Cir. 2010)).

As Defendant notes, Plaintiff's claim for damages is based on a breach of Section 6 of the MSA. See (Document No.1, pp. 4-5); (Document No. 39, p. 26). In Section 6, the Contract provides that upon termination "FD may purchase [ISS owned] equipment in accordance with the purchase price formula set forth in the applicable SOW." (Document No. 1, p. 4) (quoting Document No. 35, p. 4). The Complaint asserts multiple times that Defendant agreed to return the Digital Witness Equipment, or purchase it "at the applicable prices set forth in the DW SOW."

16

(Document No. 1, p. 5) (citing Document No. 35, p. 4). Based on Defendant's alleged breach,

Plaintiff now seeks "an award of damages in excess of $2.5 million." (Document No. 1, pp. 5-7).

In support of summary judgment, Defendant argues that

> the damages forecast by ISS hardly comport with its contractual theory: (1) there is no "purchase price formula" by which to calculate the repurchase of equipment; (2) the contract requires only that Family Dollar return used ISS-owned equipment, not new equipment; and (3) not only are ISS's alleged damages based exclusively on new equipment that applies no depreciation factor, ISS derived most of those prices from a private internal database and not from the contract.

(Document No. 39, p. 26).

Defendant argues that Plaintiff's "'expectation damages' arising from the failure to return

years-old equipment are indisputably equal to the fair market value of the equipment at the time

of the contract's termination." (Document No. 39, p. 27) (citing <u>Bartlett Milling Co., L.P. v.

Walnut Grove Auction and Realty Co., Inc.</u>, 192 N.C.App. 74, 81 (2008)). Nevertheless, Plaintiff

has failed to "forecast, produce in discovery or rely upon any damages methodology based on

anything but 'new' equipment." <u>Id.</u> (citation omitted). In "sharp contrast" to the Digital Witness

SOW, the Flat Rate SOW sets forth a schedule of prices for used digital witness equipment.

(Document No. 39, p. 28); <u>see also</u> (Document No. 40-1, p. 13). Defendant concludes that "[a]fter

a year of discovery, ISS can forecast no admissible evidence to support their 'lead' damages theory

or any other appropriate theory of damages." (Document No. 39, p. 29).

In response, Plaintiff states that its "damages calculation is reasonably certain," but cites

to no evidence or legal authority to support that conclusion. (Document No. 47, p. 28). Instead,

Plaintiff contends that 40% of the Digital Witness Equipment "is either with ADT or was reused

as part of ADT's security services" and that 60% of the Digital Witness Equipment is in storage in Rhode Island. Plaintiff concludes that the equipment "is therefore valueless to ISS." Id.

Plaintiff goes on to acknowledge that it calculated damages based on analysis of the equipment installed in a "representative store, which it extrapolated to the other stores," and based on buying "new equipment." Id. Plaintiff concludes its "methodology is reasonable and sufficiently reliable." Id.

In reply, Defendant argues that the Contract provides no basis "to now claim the value of the equipment *as new*." (Document No. 51, p. 17). Defendant suggests that Plaintiff is inserting "terms into the contract that do not exist." Id. Defendant notes that the "contract says nothing about Family Dollar returning the equipment in good, working order; and that even if it had breached a duty to return the equipment, "ISS has suffered no harm by Family Dollar's failure to return 'valueless' equipment." Id.

Defendant further notes that Plaintiff's response failed to address the fact that there is no "purchase price schedule" in the "applicable statement of work." (Document No. 51, p. 18). Moreover, the Flat Rate SOW's purchase price schedule shows that the equipment's value significantly depreciates. Id. (citing Document No. 40-1, p. 13). Plaintiff's demand that Defendant pay Plaintiff the value of new equipment "contradicts the actions of both parties and the terms of the parties' agreement." Id.

In conclusion, Defendant argues that:

> A jury cannot be presented with the option of ordering Family Dollar to pay damages that the parties never contemplated. *See PLS Invest., LLC v. Ocwen Loan Serv., LLC*, 2017 WL 424897, at *9 (W.D.N.C. Jan. 31, 2017) (whether a party presents a sufficient forecast of damages evidence is question of law). To do so would remove the certainty that parties require when entering commercial contracts like this one. Even assuming Family Dollar breached the contract, ISS has merely presented evidence that

18

> Family Dollar failed to return or purchase "valueless" equipment. As a result, this Court should rule as a matter of law that ISS has failed to present any reasonably reliable forecast of its damages.

(Document No. 51, p. 19).

This case presents a close call, but the undersigned is persuaded that there are genuine issues of material fact regarding the alleged breach of contract, and thus, this matter should proceed to trial where the Court can better weigh the evidence, including the credibility of witnesses, in determining the parties' intent. Contrary to both sides' contention that the Contract is "clear," the undersigned finds that the Contract is reasonably susceptible to different interpretations of who owned the equipment at the Conversions, and is thus ambiguous. <u>See</u> (Document No. 39, p. 6; Document No. 42, p. 13). In particular, the meaning and intent of Section 6 of the Amended MSA and Section 2.2 of the DW SOW are hotly contested by the parties.

Defendant persuasively argues that Plaintiff offers no explanation for the missing "purchase price formula set forth in the applicable SOW," or any basis for how a finder of fact could find Defendant responsible for reimbursing Plaintiff for the purchase of *new* equipment. The Complaint clearly states that Defendant can purchase the equipment "at the agreed upon prices which the parties previously negotiated and included in the DW SOW." (Document No. 1, ¶ 14).

The undersigned intends to keep an open mind, but Plaintiff is respectfully advised that even *if* it can persuade the Court that Defendant breached the Contract, any calculation of damages should be guided, and limited, by the terms of the Contract. Pursuant to Section 6 of the Contract, such calculation would involve the return of equipment and/or compensation based on the "the purchase price formula set forth in the applicable SOW." <u>See</u> (Document No. 35, p. 4). Plaintiff's counsel suggested at the hearing that Plaintiff could provide the fair market value of the disputed

19

equipment at the time of the alleged breach, but it does not appear that such information has been compiled or otherwise exchanged between the parties during discovery. If a trial is necessary, the Court will consider admissible evidence related to the parties' intent in forming the contract, including whether, and how, the parties intended a "purchase price formula" to apply to equipment installed at the Conversion store sites.

In short, Defendant's argument for summary judgment based on this damages issue is compelling. Still, the undersigned is reluctant to grant summary judgment on this basis.

Regarding the claims for conversion and unjust enrichment, this Court's decision in Synergy Fin., L.L.C. v. Zarro, 1:04-CV-041-LHT-DLH, 329 F.Supp.2d 701 (W.D.N.C. 2004), cited by Defendant, is instructive:

> "Unjust enrichment 'is described as a claim in *quasi* contract or a contract implied in law.' If there is a contract between the parties, the contract governs the claim and the law will not imply a contract." *Norman Owen Trucking v. Morkoski,* 131 N.C.App. 168, 177, 506 S.E.2d 267, 273 (1998). Such is the case here and Plaintiffs are relegated to their claim for breach of contract. *Southeastern Shelter Corp. v. BTU, Inc.,* 154 N.C.App. 321, 331, 572 S.E.2d 200, 207 (2002).

Synergy, 329 F.Supp.2d at 708. The Synergy decision also states that "where the exercise of right of ownership is done pursuant to the terms of a contract, no cause of action for conversion will lie." Id.

Other caselaw from this Court further supports the dismissal of both Plaintiff's conversion and unjust enrichment claims. See Planet Earth TV, LLC v. Level 3 Communications, LLC, 1:17-CV-090-MR-DLH, 2018 WL 3660205, at *2-3 (W.D.N.C. Aug. 2, 2018) ) ("Plaintiff's conversion claim is not distinct from its breach of contract claim" . . . "Since the parties do not dispute the existence of a contract in this case, there can be no recovery by the Plaintiff on the theory of unjust

enrichment."); Best v. Time Warner, Inc., 5:11-CV-104-RLC-DSC, 2013 WL 66265, at *4-5 (W.D.N.C. Jan. 4, 2013) ("this case presents a straightforward contract dispute, and these tort claims [including unjust enrichment and conversion] will accordingly be dismissed."); CS Tech., Inc. v. Horizon River Techs., LLC, No. 3:18-CV-273-RJC-DSC, 2020 WL 4546436, at *7 (W.D.N.C. Aug. 6, 2020) (quoting Legacy Data Access, Inc. v. Cadrillion, LLC, 889 F.3d 158, 164 (4th Cir. 2018) ("North Carolina law requires courts to limit plaintiffs' tort claims to only those claims which are identifiable and distinct from the primary breach of contract claim.").

Based on the foregoing, the Court finds that Defendant's summary judgment motion should be denied as to the breach of contract claim, and granted as to Plaintiff's unjust enrichment and conversion claims.

## B. Plaintiff's Motion For Partial Summary Judgment

Plaintiff's motion seeks partial summary judgment finding

> (1) that the contract is ambiguous as to what Digital Witness Equipment was "ISS owned" and what Digital Witness Equipment must be returned or purchased by Defendant Family Dollar, Inc. ("Family Dollar") upon termination, (2) find that course of dealing evidences that the Digital Witness Equipment that ISS installed at the Conversions and for which Family Dollar paid nothing is ISS-owned, and (3) find that Family Dollar is in breach of the Contract for its failure to return or purchase the ISS-owned Digital Witness Equipment.

(Document No. 41, p. 1).

The undersigned finds that the parties' arguments in the briefing on the cross motions for summary judgment are mostly the same, and therefore, the briefing related to Plaintiff's motion does not change the Court's conclusion about the posture of this case. In short, the undersigned agrees there is some ambiguity as to what, if any, Digital Witness Equipment was ISS owned in

the Conversions, and there is extrinsic evidence that lends some support to both parties' positions. Thus, absent a resolution by the parties, this matter will promptly proceed to a bench trial.

## C. "Defendant's Motion To Strike Declaration Of Kenneth Obermeyer…"

Defendant's motion argues that there is "no basis in the Federal Rules of Civil Procedure, this Court's Local Rules, the Scheduling Order, or the Court's May 2, 2023[,] Order permitting ISS's filing of the Supplemental Declaration." (Document No. 65, p. 10). Defendant then notes that the Federal Rules "do not permit a last-minute filing of an affidavit to support or oppose a summary judgment filing." (Document No. 65, p. 2) (citing Fed.R.Civ.P. 6(c)(2)) ("[a]ny affidavit supporting a motion must be served with the motion."). Defendant further notes that the Court's Order directing the filing of a supplemental brief "did not permit the introduction of new factual evidence" and limited the supplement filing to **five (5) pages** or less. Id.; see also (Document No. 68).

In response, Plaintiff argues that Defendant's argument is "misplaced." (Document No. 69, p. 1). Plaintiff asserts that the "Court did not prohibit ISS from submitting exhibits in support of its Supplemental Brief." Id.

In reply, Defendant re-asserts that Plaintiff's declaration "is procedurally improper" and "contradicts Mr. Obermeyer's prior testimony and ISS records." (Document No. 70, p. 2).

In directing the supplemental briefing, the Court only sought five (5) pages or less of argument on the parties' positions regarding damages. The Court did not seek, nor anticipate, any attachments, much less new declarations or evidence. Therefore, the undersigned will grant the motion to strike and respectfully decline to consider Mr. Obermeyer's Declaration (Document No. 63-1) in reaching a determination on the pending motions for summary judgment.

## IV.    CONCLUSION

**IT IS, THEREFORE, ORDERED** that "Defendant's Motion For Summary Judgment" (Document No. 38) is **GRANTED in part and DENIED in part**.  As discussed herein, Plaintiff's breach of contract claim survives based on questions of fact regarding the parties' intent;  however, the conversion and unjust enrichment claims are dismissed as a matter of law.

**IT IS FURTHER ORDERED** that "Interface Security Systems, L.L.C.'s Motion For Partial Summary Judgment" (Document No. 41) is **DENIED**.

**IT IS FURTHER ORDERED** that "Defendant's Motion To Strike Declaration Of Kenneth Obermeyer In Support Of Interface Security Systems, L.L.C.'s Damages Methodology And Evidence" (Document No 65) is **GRANTED**.

**IT IS FURTHER ORDERED** that a final pretrial conference is scheduled for **2:00 pm** on **August 24, 2023**.

**IT IS FURTHER ORDERED** that a bench trial is scheduled for at **9:00 am** on **August 30, 2023**.

**SO ORDERED**.

Signed: July 21, 2023

David C. Keesler
United States Magistrate Judge